STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. AUS-
TIN CLARK, ALSO KNOWN AS DICK AUSTIN, PLAIN-
TIFF IN ERROR.

Argued January 20, 1948—Decided March 4, 1948.

Before CASE, CHIEF JUSTICE, and Justice BURLING.

For the defendant in error, *David R. Brone* and *Lewis P.
Scott*, Prosecutor of the Pleas of Atlantic County.

For the plaintiff in error, *Carl Kisselman* and *Samuel P.
Orlando*.

The opinion of the court was delivered by

CASE, CHIEF JUSTICE. The case comes up on assignment
of errors and also, under the statute (*R. S.* 2:195–16) and
with a certification of the entire record, on specification of
causes for reversal.

The plaintiff in error, Austin Clark, was convicted under
an indictment charging that on or about July 23d, 1946, at
a named building in Atlantic City he "did unlawfully keep
a place to which persons might and did resort for gambling
by playing for money at and with cards and dice, with the
intent that said persons might and did resort thither for
gambling by playing for money at and with cards and dice;
and in which premises they did, on the date aforesaid, engage
in gambling by playing for money at and with cards and
dice, to the evil example of all others in like case offending,

contrary to the form of the statute in such case made and provided, and against the peace of this State, the government and dignity of the same." The indictment contained three counts, the first charging the keeping of a disorderly house, the second charging as stated above and the third charging much as in the second but naming an extended period from May 23d to July 23d. The verdict was "not guilty" as to the first and third counts and "guilty" as to the second count.

The second count of the indictment was rested upon *R. S.* 2:135–3, as amended by chapter 205, *Pamph. L.* 1940, which provides that:

"Any person who shall habitually or otherwise, buy or sell what is commonly known as a pool, or any interest or share in any such pool, or shall make or take what is commonly known as a book, upon the running, pacing or trotting, either within or without this State, of any horse, mare or gelding, or shall conduct the practices commonly known as bookmaking or pool selling, or shall keep a place to which persons may resort for engaging in any such practices, or for betting upon the event of any horse race, or other race or contest, either within or without this State, or for gambling in any form, or any person who shall aid, abet or assist in any such acts, shall be guilty of a misdemeanor * * *."

The question is whether the court erred in using the italicized words in the following portion of the charge to the jury:

"Now, you perceive to convict under the statute, it must be proved that the proprietor kept the place with the intent that persons might resort there for betting. In other words, to convict under this act it must appear from the testimony that the person kept the premises with the intent that people might come there to gamble or make bets of some kind as defined in the statute, and that, as I have already told you, is not an element of the common law crime of keeping a disorderly house. *On the other hand and at the same time, under this act it is not necessary to show that the place was habitually conducted; that the practices continued for a long period of time. It is enough that it be shown that the practice was conducted by someone on a solitary occasion. That would be a violation of the act.*"

Plaintiff in error seeks to place the indictment in that class of offenses where habitual or repeated acts must be shown, namely, in the category of maintaining a disorderly house. The theory upon which an indictment of the latter type runs is that an act which, as an isolated instance, is unlawful but not criminal may, by repetition, impute disorderliness to a premises and so become the subject of indictment and punishment. *Cf. Haring* v. *State,* 51 *N. J. L.* 386; *affirmed,* 53 *Id.* 664. Plaintiff in error argues therefrom that the court's charge was incorrect. That reasoning would be sound if the statute, by fair intendment, required the inhibited act to be habitual in order to constitute the crime. But the language of the statute (*R. S.* 2:135–3, *supra*) is "habitually or otherwise." "Habitually" and "otherwise" are in juxtaposition with antithetic effect. They are separated only by the co-ordinating particle which marks an alternative. They are clearly used to signify that the named acts are misdemeanors even if not done habitually. The next question is whether the words "habitually or otherwise" relate to "gambling in any form." By meticulous grammatical construction perhaps they do not. But the Court of Errors and Appeals has construed them as doing so. The language of that court follows: "The pertinent part of the section of the Crimes Act therein alleged to have been violated provides that any person who shall habitually or otherwise keep a place to which persons may resort for gambling in any form, or aiding, abetting or assisting therein, shall be guilty of a misdemeanor." *State* v. *Terry,* 91 *Id.* 539, 540. The reference was to section 65 of the 1898 Crimes Act (2 *Comp. Stat., p.* 1766) from which our present statute came and which, in its pertinent parts, has the same wording. We feel constrained to follow the lead of the Court of Errors and Appeals.

For the reason stated we conclude that the portion of the charge which said that it was not necessary to show habitual or long continued operation conformed to the statute.

It remains to consider whether the court erred in saying that it was enough if the practice was conducted on a solitary occasion. On a view of the whole case and the entire charge we think that the court did not err. Intent is an essential

ingredient of the crime and an ultimate aim of the proof under the indictment. *State* v. *Ackerman*, 62 *N. J. L.* 456; *State* v. *Hoffman*, 9 *N. J. Mis. R.* 270; *State* v. *O'Donnell*, 9 *Id.* 301. Mr. Justice Dixon said for the court in *State* v. *Ackerman:* " 'If any person shall keep a place to which persons may resort for betting,' do not import the keeping of a place to which it is possible for persons to resort for betting, nor the keeping of a place to which persons do in fact resort for betting. Their fair import is the keeping of a place with the intent that persons shall resort thither for betting." The court below charged that *intent* must be shown on this indictment and that it must be further shown that the proprietor *kept* the place with the *intent* that people might come there to gamble.

There was proof from which it could be found: Clark owned the premises and lived upstairs. The room next to that where the raid occurred was occupied as a saloon and operated in the name of another person, but that person was Clark's former wife whom Clark assisted in operating the business—"I sold the saloon to my former wife * * * I help her supervise. She asks me questions. I tell her." Clark there maintained a public telephone in his name. A witness who was a co-defendant under the indictment, but was not then being tried, called the raided room the "gambling house." Clark himself referred to it as the "crap room." The captain of police with a "crew" of seven men raided that room at 2:30 or 3:00 o'clock in the morning. A crowd of ten or fifteen men surrounded a table and were gambling with dice in a game known as "craps." Dice were in the process of being "rolled." In the room were Clark and sixteen other persons. On the playing table was a yellow crap cloth with numbers printed thereon; there was a dice box with dice, two tin boxes known as "cut" boxes into which the cut from each "throw" was placed for the "house;" a "crutch" stick by which the operator raked in the money stakes, the sum of $147.15, partly on the table and partly in the "cut" box. Clark was at the table with the money in front of him. Decks of playing cards were lying on a table. Gambling had been observed in progress there before the day named in the indict-

ment. After the raid Clark induced his co-defendant to go before the magistrate and plead guilty to the charge of operating the gambling house, saying "Go up to the court and take the rap. * * * Take the rap. There won't be nothing to it."

The congeries of proofs, including the setting, the character of the preparations, the nature of the arrangements, the paraphernalia and, it may be added, the atmosphere, were such as to permit, in our opinion, the inference that the establishment was not one upon which the participants in the game had casually happened or that it was in existence for just the day on which the raid was made; but on the contrary that it was a kept place, a place of resort maintained by Clark with the intent that people should there resort for gambling and that people did accordingly resort thereto for that purpose. Let us suppose that in addition to the facts in proof it had also appeared that on the street side of the establishment the officers in making the raid had found an exposed sign bearing this public announcement: "This room, owned and kept by Austin Clark, is a place to which persons may resort for gambling in the game of craps." Would that, considered along with the existing proofs, have left any reasonable doubt that Clark was, on that day, keeping a place to which persons might resort for gambling in the designated form? We think not. Yet the jury could infer from the proofs all that such a hypothetical sign would have disclosed. It is necessary to distinguish between the common law offense of maintaining a disorderly house, or a statutory óffense which, in effect, restates the common law, and an offense under a statute which varies the common law by eliminating or modifying the requirement that the unlawful act should be repetitious, continuous or habitual. *Cf.* 27 *C. J.* 1012, *tit.* "*Gaming,*" § 171; 38 *C. J. S.* 164, *tit.* "*Gaming,*" § 102. A disorderly house at common law and the crime for which conviction was there had are entirely separate offenses. *State* v. *Griffin,* 85 *N. J. L.* 613. Under proper statutory definition even a single act, such as that of an illegal sale of liquor, has been held to be a disorderly act. *Parker* v. *State,* 61 *Id.* 308; *affirmed,* 62 *Id.* 801; *State* v. *Fay,* 44 *Id.* 474. Again, and

still with respect to an indictment for keeping a disorderly house, which, as we have said, connotes the element of frequency or habitual repetition, this court has said:

"If a man who had no bar fitted up and no provision made for supplying all who apply, and no accommodations inviting the public, should sell liquor on a single Sunday, there would be an absence of circumstances to lead a jury to infer that he was engaged in the business of carrying on an illegal traffic. On the contrary, if his premises are specially adapted to, and furnished for the pursuit of the unlawful business, and persons who apply are generally admitted to enter his premises on a Sunday, then the further proof that there are repetitions of the sale of spirituous or malt liquors on that single Sunday would constitute a state of facts from which a jury would be justified in finding that the keeper of such a house was guilty of the common practice of violating the law."

*Brown* v. *State,* 49 *N. J. L.* 61. The proofs, in the light of the statute and of the decisions, were sufficient, we think, to support a finding that the plaintiff in error did then and there keep a place to which people might resort for gambling and that people had betaken themselves there and engaged promiscuously in gambling in accordance with and in reference to that intent; and that was the purport of the court's charge to the jury. If the court had charged that it was enough that a gambling game had been played on a solitary occasion, and had left the instruction in just that shape, there would have been error, because the jury would then have been free to convict without proof of "intent" or proof that the room was "kept" as a place where people might "resort" for gambling. But the court did not leave the jury under that misapprehension.

Plaintiff in error rests largely upon *State* v. *Cieri,* a Connecticut case reported in 20 *Atl. Rep.* (2d) 733. That case arose out of a Connecticut statute which did not, as is fairly clear, contain the words "habitually or otherwise." The opinion cites, and plaintiff in error's brief does also, *Commonwealth* v. *Charlie Joe,* 139 *Mass.* 383; 79 *N. E. Rep.* 737. That decision sustained a conviction on a charge of keeping a common gaming house, where the evidence was that on

different occasions sounds had been heard indicating that a game of some kind was in progress, and on one occasion officers found several men playing cards with money on the table. It is not, we think, a case in point *contra* our view. The Cieri decision also cites *Engeman* v. *State,* 54 *N. J. L.* 257, and *Haring* v. *State, supra.* The Engeman and the Haring cases were on indictments for keeping disorderly houses where betting and bookmaking were habitually carried on. They, too, are, therefore, distinguishable.

The judgment below will be affirmed.